723 A.2d 644

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Kevin M. SIERRA, Appellee.**

Supreme Court of Pennsylvania.

Argued Jan. 29, 1997.

Decided Jan. 6, 1999.

Joseph C. Adams, H. Stanley Rebert, York, for Com.

Michael F. Fenton, Michael Baldauff, York, for Kevin M. Sierra.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## *ORDER*

PER CURIAM:

**AND NOW**, this 6th day of January, 1999, the Court being evenly divided the order of Superior Court is Affirmed.

Justice NIGRO files an Opinion in Support of Affirmance.

Justice CASTILLE files an Opinion in Support of Reversal in which Justice NEWMAN joins.

Justice CAPPY files an Opinion in Support of Reversal.

### *OPINION IN SUPPORT OF AFFIRMANCE*

NIGRO, Justice.

This is an appeal by the Commonwealth from an order of the Superior Court reversing appellee's judgment of sentence for firearms offenses and remanding for further proceedings. At issue is whether the evidence seized from appellee during a vehicle stop should have been suppressed. For the reasons which follow, we affirm.

In reviewing a suppression court's ruling, we are bound by those factual findings of the suppression court which are supported by the record. *Commonwealth v. Slaton*, 530 Pa. 207, 208, 608 A.2d 5, 5 (1992); *Commonwealth v. James*, 506 Pa. 526, 533, 486 A.2d 376, 379 (1985); *Commonwealth v. Lark*, 505 Pa. 126, 129, 477 A.2d 857, 859 (1984).

In the instant case, the trial court made the following findings of fact, which are uncontested by the parties. Appellee was the passenger in a car which West Manchester Township Police Officer Jeffrey Oberdorff observed speeding shortly after midnight on November 21, 1993. Since Officer Oberdorff was proceeding in the opposite direction, he radioed a colleague, Officer Keith Roehm, and advised him of his observations. Officer Roehm followed the vehicle for three or four tenths of a mile and determined that it was travelling twenty to twenty-five miles per hour over the posted forty mile per hour speed limit.

After stopping the vehicle, Officer Roehm noticed that it had dealer plates. Officer Roehm asked the driver for his license, vehicle registration, and insurance card. The driver complied with the request. Noticing that the license had expired, that the driver had a gang tattoo under his left eye, that the car contained a number of boxed motorcycle parts, and that the occupants of the car appeared nervous, Officer Roehm then asked whether there was anything illegal in the vehicle. After the driver responded in the negative, Officer Roehm proceeded to his police cruiser to check the license status and to write a warning for speeding.

A few moments later, as Officer Roehm returned to the vehicle, Officer Oberdorff arrived on the scene and positioned himself beside the passenger side of the car. After handing the driver his documentation and having him sign the written warning, Officer Roehm again asked if there was anything illegal in the car. The driver said, "No, would you like to look?," to which Officer Roehm responded, "Yes, if you don't mind."

Officer Roehm then asked the two men to exit the vehicle so the officers could conduct a brief pat-down search for weapons. While patting down appellee's clothing, Officer Oberdorff found a semi-automatic handgun in the waistband in the back of appellee's pants. Three months later, after it was determined that appellee had no permit for the gun, he was arrested and charged with violating the prohibition against former convicts owning firearms[1] and carrying a firearm without a license.[2]

Appellee filed an omnibus pretrial motion seeking suppression of the physical evidence. Following an evidentiary hearing, the motion was denied. Appellee was subsequently convicted after a bench trial and sentenced to a term of nineteen to thirty-eight months' imprisonment.

On appeal, the Superior Court reversed, reasoning that Officer Roehm lacked a reasonable suspicion of criminal activity at the time of his second inquiry regarding the presence of

1.  18 Pa.C.S. § 6106 (1983 & Supp.1997).
2.  18 Pa.C.S. § 6105 (1983 & Supp.1997).

illegal items in the automobile and thus had no legitimate basis to continue his investigation. The court concluded that as a result, the driver's consent to search the car and the subsequent pat-down search of appellee were tainted.

The Commonwealth then filed a Petition for Allowance of Appeal. This Court granted allocatur to examine: (1) whether Officer Roehm's continued questioning of the driver regarding the contents of the car constituted an investigative detention; (2) if so, whether the detention was justified; and (3) if there was an illegal detention, whether the driver's subsequent consent to search the vehicle and the pat-down search of appellee were tainted by the illegal detention.

The first step in our analysis is to determine whether Officer Roehm's questioning of the driver after Roehm had returned the driver's license and issued a traffic warning constituted an investigative detention.[3]

An investigative detention occurs when a police officer temporarily detains an individual by means of physical force or a show of authority for investigative purposes. *Commonwealth v. Lopez*, 415 Pa.Super. 252, 258, 609 A.2d 177, 180, *appeal denied* 533 Pa. 598, 617 A.2d 1273 (1992). *See also Commonwealth v. Lewis*, 535 Pa. 501, 636 A.2d 619 (1994). Such a detention constitutes a seizure of a person and thus

**3.** Fourth Amendment jurisprudence sets forth three categories of interaction between citizens and the police:

The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. See *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). The second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. See *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Finally, an arrest or "custodial detention" must be supported by probable cause. See *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Commonwealth v. Rodriquez*, 532 Pa. 62, 614 A.2d 1378 (1992).
*Commonwealth v. Ellis*, 541 Pa. 285, 293–94, 662 A.2d 1043, 1047–48 (1995)(footnote omitted).

activates the protections of the Fourth Amendment and the requirements of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Lopez,* 415 Pa.Super. at 258–59, 609 A.2d at 180; *Lewis,* 535 Pa. at 507–08, 636 A.2d at 622–23. In order to determine whether a particular encounter constitutes a seizure/detention, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' request or otherwise terminate the encounter." *Lewis,* 535 Pa. at 509, 636 A.2d at 623 (quoting *Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)).

█ In the present case, the Commonwealth argues that the officer's questioning cannot be characterized as an investigative detention because Officer Roehm had returned the driver's license and registration and had issued a warning for speeding prior to asking any questions of the driver, because there was no show of physical force or authority over the driver, and because the question asked by Officer Roehm was not a request to search the vehicle.

Given the circumstances surrounding the encounter, we cannot agree that the occupants should have known that they could depart once the officer returned the driver's documentation and issued the warning. At the time the driver's documentation was returned, two officers continued to surround the vehicle. Additionally, Officer Oberdorff arrived on the scene after the first question had been posed by Officer Roehm, thus heightening the coercive atmosphere at the time of the second question. Further, Officer Roehm exerted continued pressure on the driver by repeating the same question despite having received a negative response to his initial inquiry. The cumulative effect of these circumstances was such that no reasonable person would have felt free to terminate the encounter. *See Berkemer v. McCarty,* 468 U.S. 420, 436, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)("a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle. . . . Certainly few motorists would feel free . . . to leave the scene of a traffic

stop without being told they might do so."); *Commonwealth v. Parker,* 422 Pa.Super. 393, 619 A.2d 735 (1993)(holding that police officer's continued detention of driver stopped for traffic violation, after officer issued traffic citation, constituted seizure and was improper). Thus, we conclude that the officer's continued questioning of the driver constituted an investigative detention.[4]  Next, we must examine whether Officer Roehm had a reasonable basis to justify detaining the vehicle for investigative purposes.  An investigative detention constitutes a seizure of a person and therefore must be supported by reasonable suspicion that those detained are engaged in criminal activity. *Ellis,* 541 Pa. at 294, 662 A.2d at 1047. *See also Lopez,* 415 Pa.Super. at 261, 609 A.2d at 182 (holding that once matters relating to initial traffic stop had been resolved, in order to justify detaining driver for further questioning, officer must have reasonable suspicion of illegal transactions in drugs or of any other serious crime).

The Commonwealth asserts that Officer Roehm possessed the requisite reasonable suspicion based on his observations that the vehicle had dealer's tags, that there were boxes of loose motorcycle parts in the back seat, that the stop occurred at 12:22 a.m., and that both appellee and the driver appeared to be more nervous than most people would be during a routine traffic stop.  We disagree.

None of the officer's observations demonstrate, or even suggest, illegal activity.  We are not persuaded by the Commonwealth's assertion that Officer Roehm reasonably believed that the vehicle may have contained stolen parts, as Officer

---

4. In his dissenting opinion, Justice Castille states that *Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), "determined that an officer does not, merely by asking a question of the driver during a lawful traffic stop, initiate an investigative detention."  Dissenting Opinion at 651.  I disagree with this reading of *Robinette.* The *Robinette* Court did not specifically discuss whether the questioning of the defendant under the circumstances presented constituted an investigative detention.  However, the Court did evaluate the issue of the legality of what it called the "continued detention" of the driver in that case. *Robinette,* 519 U.S. at 36–38, 117 S.Ct. 417 (emphasis added).  Thus, by implication, the *Robinette* Court, contrary to the assertions of the dissent, considered the questioning by the police following the return of the driver's documentation to constitute a detention.

Roehm was unable to articulate any basis for such a suspicion beyond his mere observation of the parts in the rear of the vehicle[5] and the Commonwealth has failed to identify any facts surrounding the encounter which would support such a conclusion. In fact, not only was Officer Roehm unable to offer any reasonable basis for his suspicion that the motorcycle parts were stolen, Roehm himself testified at the suppression hearing that he had no indication of any on-going crime at the time he returned the driver's documentation and questioned him about the contents of the car. N.T., July 7, 1994, at 12. Accordingly, because Officer Roehm had no legitimate basis to suspect that criminal activity was afoot, we conclude that he had no legitimate basis to detain the occupants of the vehicle once matters relating to the speeding violation had been resolved. Thus, the detention was unlawful. *See Parker*, 422 Pa.Super. at 400, 619 A.2d at 738 (holding that following traffic stop, without articulable grounds to suspect the presence of drugs or other contraband, officer's authority was limited to issuing a traffic ticket for the original motor vehicle violation).

The final issue presented in this case is whether the driver's consent to search the vehicle was tainted by the illegal deten-

---

**5.** With respect to the motorcycle parts, Officer Roehm testified:

> As I looked into the vehicle I saw all kind of motorcycle parts in boxes in the rear of the passenger compartment behind the driver's seat. That raised my suspicion that maybe they are stolen parts or something from motorcycles. They looked like motorcycle, you know, guys that would drive motorcycles. They didn't look like car dealers to me.

N.T., Dec. 2, 1994, at 26. Later, on cross-examination, the following exchange took place:

> Q. ... You have testified as to there being motorcycle parts in the back of the car, is that correct?
> A. That is correct.
> Q. Did you ask what they were doing there, why they had them?
> A. Yes, I did.
> Q. And what kind of an answer did you get, if any?
> A. They said that they had just bought some parts, and they were coming from a friend's house.
> Q. So as far as your knowledge at that point they gave you a legitimate basis for having such parts?
> A. Yes.

*Id.* at 36.

tion. The Commonwealth claims that the search was proper because the driver's consent to the search was voluntary. Again, we disagree.

When a consensual search is preceded by an illegal detention, "the government must prove not only the voluntariness of the consent under the totality of the circumstances, but ... must also establish a break in the causal connection between the illegality and the evidence thereby obtained." *United States v. Melendez–Garcia,* 28 F.3d 1046, 1053 (10th Cir.1994). *See also United States v. Jerez,* 108 F.3d 684 (7th Cir.1997). In determining whether the consent has been vitiated by the taint of the preceding illegal detention, the reviewing court must consider: " '(1) the temporal proximity of the illegal detention [and the defendants' consent]; (2) the presence of intervening factors between the two events; and (3) the circumstances surrounding, and the nature of, the official misconduct.' *United States v. Sanchez–Jaramillo,* 637 F.2d 1094, 1099 (7th Cir.)(citing *Brown v. Illinois,* [422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) ] ), *cert. denied,* 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 79 (1980)." *Jerez,* 108 F.3d at 695. *See also United States v. Chavez–Villarreal,* 3 F.3d 124, 127–28 (5th Cir.1993); *United States v. Campbell,* 920 F.2d 793, 797 (11th Cir.1991); *United States v. Delgadillo–Velasquez,* 856 F.2d 1292 (9th Cir.1988).

■ Under the facts of the present case, there was insufficient attenuation between the consent and the illegal detention to purge the taint of the officers' illegal conduct. The driver consented to the search only moments after his documentation had been returned. Moreover, there were no intervening circumstances which would have diminished the coercive atmosphere of the illegal detention or otherwise justified the search. Finally, as previously noted, at the time the driver offered to allow the search, the vehicle was surrounded by two troopers and Officer Roehm had just repeated his inquiry regarding the contents of the car for a second time despite the fact that the driver had already responded to his initial inquiry in the negative. Under such circumstances, the driver's consent was tainted by the officers' conduct and was therefore

ineffective to justify the search. *See Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)(plurality opinion)(finding that because defendant was being illegally detained when he consented to the search of his luggage, his consent was tainted by the illegality and could not justify the search); *Commonwealth v. Helm*, 456 Pa.Super. 370, 690 A.2d 739 (1997)(holding that because consent to search vehicle's trunk was obtained during course of illegal detention, evidence obtained from search must be suppressed); *Commonwealth v. Pless*, 451 Pa.Super. 209, 679 A.2d 232 (1996)(holding that because detention was improper, defendant's consent was ineffective to justify search of vehicle); *Lopez*, 415 Pa.Super. at 262, 609 A.2d at 182 (concluding that because detention of defendant was illegal, defendant's consent to search of car was tainted).

Since the officers lacked reasonable suspicion to support the detention and the driver's consent was tainted, the officers had no authority to search the car. Therefore, they had no justification for ordering appellee out of the vehicle pursuant to the search and subsequently patting him down.[6] As a result, the evidence seized during the pat-down search should have been suppressed.

Accordingly, we affirm the order of the Superior Court.

## OPINION IN SUPPORT OF REVERSAL

CASTILLE, Justice.

The plurality affirms the Superior Court's judgment that the evidence of the firearm found on appellee's person must be suppressed because: (1) by asking a single question of the driver of an automobile which had been stopped for speeding, the police officer here initiated an "investigative detention;" (2)

---

6. Although we conclude that the detention in the present case was unlawful and the consent to search tainted, we note that where a motor vehicle has been *lawfully* detained, an officer may order the occupants to get out of the vehicle. *See Pennsylvania v. Mimms*, 434 U.S. 106, 110–12, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). Once the occupants have alighted, the officer may conduct a pat-down search for weapons if the officer reasonably concludes that the occupants may be armed and presently dangerous. *Id.* at 111–12, 98 S.Ct. 330.

the detention was not justified by a reasonable suspicion that criminal activity was afoot; and (3) the driver's subsequent consent to search the vehicle and the pat-down search of appellee, a passenger in the vehicle, were tainted by the illegal detention. I would reverse for two reasons. First, in my view, the single question that Officer Roehm asked the driver after lawfully stopping him for speeding did not result in an "investigative detention" for purposes of the Fourth Amendment. Second, even if the question did constitute an "investigative detention," the Fourth Amendment still would not afford any relief since such a detention would have been amply supported in this matter by the officer's reasonable suspicion that criminal activity was afoot.[1]

The record in this case reveals that shortly after midnight on November 21, 1993, Officer Roehm stopped the TransAm automobile in which appellee was a passenger for speeding twenty-five miles per hour over the posted speed limit. Officer Roehm noticed that the car had dealer plates, that it contained a number of boxed motorcycle parts, and that the driver and occupants appeared unusually nervous for a routine traffic stop.

After asking the driver for his license and registration, Officer Roehm noticed that the license was expired, that the registration did not match the vehicle, and that the driver had a "gang tattoo" under his left eye. Based on the sum of his observations, Officer Roehm asked the driver if there was

---

1. Appellee argued that Officer Roehm's conduct violated both the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. However, the plurality rests its analysis solely on Fourth Amendment Jurisprudence. See Plur. Op. at 646. This uniform mode of analysis is consistent with the Court's reasoning in prior cases in which the Court has determined that in analyzing whether an investigative detention supported by reasonable suspicion occurred, the tests are the same under both the Pennsylvania Constitution and the United States Constitution. See Commonwealth v. Hawkins, 547 Pa. 652, 656 n. 2, 692 A.2d 1068, 1069 n. 2 (1997)(the requirements of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, are also the requirements of the Pennsylvania Constitution)(citing Commonwealth v. Melendez, 544 Pa. 323, 331–32, 676 A.2d 226, 230 (1996)).

anything illegal in the car, and received a reply in the negative.

Sometime during this exchange, Officer Jeffrey Oberdorff arrived on the scene. After checking the license status and writing a warning for speeding, Officer Roehm returned to the vehicle, where Officer Oberdorff stood guard on the vehicle's passenger side. Officer Roehm promptly returned the driver's license and registration and had the driver sign a written warning for speeding. After returning the documentation, Officer Roehm again asked the driver a single question—"do you have anything illegal in the car?" The driver responded, "No, would you like to look?" Officer Roehm stated that he would, if the driver did not mind.

In accordance with police procedure, in order to effectuate the search of the vehicle safely, the officers asked the occupants to exit the vehicle. After appellee exited from the passenger side, Officer Oberdorff asked appellee if he was carrying any weapons. Although appellee replied that he was not, he continued to back away from the officer, patting the pockets of a loose flannel shirt that he was wearing. Nervous as to appellee's intentions, Officer Oberdorff performed a brief patdown search before turning his back on appellee to conduct the search of the vehicle.[2] In performing this patdown, Officer Oberdorff found a loaded and cocked Ruger nine millimeter pistol concealed in appellee's waistband. Three months later, after it was determined that appellee had no permit for the gun, he was arrested and charged with violating the prohibition against former convicts owning firearms and carrying a firearm without a license.

## I

There is no dispute that Officer Roehm first lawfully detained the car for speeding. The only issue is whether the question that Officer Roehm asked after returning the driver's

2. Appellee does not argue that the protective frisk conducted by Officer Oberdorff was not justified under the Fourth Amendment, but rather that consent for the search which necessitated the protective frisk was tainted by the prior illegal detention.

documentation constituted a separate "seizure" or "investigative detention" as those terms are understood under Fourth Amendment Jurisprudence. *See Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)(inquiry must focus not on the intrusion resulting from the request to stop the vehicle for the traffic violation, but on the incremental intrusion resulting from the subsequent request). Under the United States Supreme Court's Fourth Amendment Jurisprudence, the brief question that Officer Roehm repeated after returning the driver's documentation simply does not constitute an "investigative detention." In determining whether a particular encounter constitutes a seizure or detention, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's request or otherwise terminate the encounter. *See Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

In *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the United States Supreme Court applied the Fourth Amendment to evaluate the actions of a police officer who had stopped an automobile at 2:40 a.m. for a violation of the California Vehicle Code.[3] After the driver failed to produce a license, the officer ordered all six occupants out of the car and asked if he could conduct a vehicle search. The driver subsequently granted permission, and the officer found three checks that had been stolen from a car wash.

The issue in *Schneckloth* was whether the state must affirmatively prove that the subject of a search understands that he has a right to refuse consent before a police officer can request permission to search. *Id.* at 229, 93 S.Ct. 2041. The United States Supreme Court noted that the officer had reason to stop the car for the initial traffic violation, but did not have probable cause either to search the vehicle or to execute a search incident to a valid arrest. *Id.* at 227, 93 S.Ct. 2041. Nevertheless, the Court determined that the driver voluntarily consented to the search and that the search was

---

3. The vehicle was being operated with a broken headlight.

not tainted by any illegality. As part and parcel of this determination, the Court necessarily determined, albeit tacitly, that the question which precipitated the consent had not amounted to an unlawful investigative detention.[4] The Court further explained that ruling that the consent to search was illegally obtained would create a precedent whereby any police inquiry, no matter how courteously made, would permit a criminal to defeat prosecution by voluntarily revealing all of the evidence against him and then contending that he acted only in response to an implied assertion of unlawful authority. *Id.* at 231, 93 S.Ct. 2041 (citing *People v. Michael,* 45 Cal.2d 751, 754, 290 P.2d at 852, 854 (1955)).

In *Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), the United States Supreme Court reaffirmed the guiding principles of *Schneckloth* in a factual scenario almost identical to the matter *sub judice.* The officer in *Robinette* had stopped a vehicle for speeding. The officer obtained the driver's documentation, ran a computer check which uncovered no previous violations, and subsequently asked the driver to step out of the car in order to issue a verbal warning. *Id.* at 35–36, 117 S.Ct. 417. At that point, after returning the driver's documents, the officer asked: "[o]ne question before you get gone—are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" The driver answered "no" to these questions, after which the officer asked if he could search the car. The driver consented, and the officer found illegal contraband therein. *Id.*

On appeal to the Ohio Supreme Court, that Court ruled that under the Fourth Amendment, citizens stopped for traffic offenses must be clearly informed by the detaining officer that they are free to go after the initial detention, before an officer

4. One might argue that the Court tacitly determined that the officer's question amounted to an investigative detention justified by a reasonable suspicion of criminal activity afoot. However, the only aspects of the situation that could have triggered any suspicions were the time of day and the driver's inability to produce adequate documentation upon request. In the matter *sub judice,* those two aspects were among the many aspects that triggered Officer Roehm's suspicions. Thus, under any possible characterization of the holding in *Schneckloth,* Officer Roehm's single question did not run afoul of the Fourth Amendment.

attempts to engage in any further consensual interrogation. *See id.* at 36–38, 117 S.Ct. 417. In reversing the state court, the United States Supreme Court stated: "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *See id.* at 39, 117 S.Ct. 417. Thus, the Court determined that an officer does not, merely by asking a question of the driver during a lawful traffic stop, initiate an investigative detention. *Id. See also United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir. 1993)(court followed "clear line historically drawn between police-citizen encounters which occur before and after an officer returns a ... driver's documentation" in assessing whether questions amounted to investigative detention).

Finally, the United States Supreme Court recently examined whether, under the Fourth Amendment, an officer may order a passenger to exit the vehicle during a routine traffic stop without effectuating an unconstitutional "seizure." *See Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). The Court held that since the passenger was already stopped and restricted in movement by virtue of the initial stop of the vehicle, the additional intrusion in being ordered out of the car pending completion of the stop was de minimus. Thus, the Court determined that ordering a passenger out of a car during an ordinary traffic stop does not amount to a seizure for purposes of the Fourth Amendment. *Id.*

In light of the United States Supreme Court's binding interpretation of the scope of the Fourth Amendment in the aforementioned cases, the single question posed by Officer Roehm *after* returning all the driver's documentation clearly did not amount to an "investigative detention." Unlike in *Robinette, supra,* here the question concerning the contents of the vehicle was not immediately followed by a second question aimed at obtaining permission to conduct a search of the car. Rather, the driver's *invitation* to search the car was proffered freely of any suggestion by Officer Roehm that it might be within the scope of his authority to conduct such a search.

.Thus, if the multifarious questioning of the officer in *Robinette*, geared directly toward obtaining permission to search the car, did not result in an investigative detention, the single, non-suggestive question asked here obviously did not even approach the threshold of an investigative detention.[5]

Nevertheless, the plurality asserts that two additional factors heightened the coercive nature of this particular encounter such that it became intrusive enough to constitute an investigative detention. First, the plurality asserts that the presence of a second officer on the scene "heighten[ed] the coercive atmosphere at the time of the second question." *See* Plur. Op. at 647. However, the United States Supreme Court has determined that the mere presence of an additional officer does not turn what would otherwise be a consensual encounter between an officer and a citizen into an investigative detention. *See Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)(two officers boarded bus during layover; one asked a passenger, without having reasonable suspicion, if they could search his luggage; held: state court improperly determined that police action automatically amounted to an investigative detention).[6]

In addition to being insupportable in law, the plurality's reasoning with respect to the presence of an additional officer is rendered all the more troublesome in light of its potential adverse effect on police officers' personal safety in this Commonwealth. Law enforcement authorities may reasonably interpret this aspect of the decision to mean that an officer may continue to follow her instincts and lawfully ask a ques-

5. Furthermore, it would be anomalous at best if putting a simple question to a driver constituted an "investigative detention" or "seizure," but categorically ordering driver and passengers out of a vehicle did not constitute such a "seizure" under the Fourth Amendment. *See Wilson, supra*, at 412, 117 S.Ct. 882. *See also Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)(once car was validly stopped for a traffic infraction, the additional intrusion of asking the driver to step outside his car was "de minimis"). The single question clearly is the less intrusive of these two types of police action.

6. The plurality cites no authority for its belief that the mere presence of an additional police officer, who does not in any way insinuate himself into the encounter at issue, necessarily heightens the level of coercion inherent in the encounter.

tion in a non-threatening way during an ordinary traffic stop only if acting alone. However, that same question becomes unlawful if the officer is accompanied by a partner for her protection. Such a result defies common sense. Under the plurality's reasoning, in order for police officers to ask a single question without fear of it rising to a constitutional violation, they must now act alone at. great risk to themselves. The plurality's holding leaves our law enforcement officers a Hobson's choice between foregoing their safety by declining to call for backup when they make a stop in order to preclude any question that they pose from ascending to an "investigative detention" or "seizure," or alternatively calling for backup to ensure their safety but face the possibility that any question they ask will subsequently be deemed a "seizure" or "investigative detention" due merely to the presence of another officer at the scene.

The plurality also asserts that the "second source" of heightened coercion in this encounter stemmed from the fact that Officer Roehm "exerted continued pressure on the driver by repeating the same question despite having received a negative response to his initial inquiry." *See* Plur. Op. at 647. The plurality neglects to mention that the officer returned to his car and ran a computer check before asking the question a second time. Thus, the single repetition did not amount to rapid-fire, interrogation-type questioning, as the plurality perhaps believes.[7] Moreover, the mere repetition of a question is ordinarily not a source of heightened anxiety unless the subject did not answer truthfully when the question was posed the first time. By examining the issue of coercion through the lens of a person who has something to hide, the plurality ignores the Supreme Court's admonition that the "reasonable person" test presupposes an innocent person. *See Florida v. Bostick* 501 U.S. at 438, 111 S.Ct. 2382 (the potential intrusiveness of the officers' conduct must be judged from the viewpoint of an innocent person in [his] position; this ensures that

7. Even if the question had been repeated immediately, the plurality fails to distinguish *Robinette, supra,* where rapid and *varied* questioning of the driver of the stopped automobile still did not amount to an investigative detention.

the scope of the Fourth Amendment protection will not vary with the individual's state of mind)(citing *Michigan v. Chesternut,* 486 U.S. 567, 574, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)).

The plurality concludes that "[t]he cumulative effect of these circumstances was such that no reasonable person would have felt free to terminate the encounter." *See* Plur. Op. at 647. The test, however, is not whether a reasonable person would have "felt" free to leave under the circumstances, but rather whether the actual *conduct* of the police *communicated* to a reasonable person that he was not free to leave.[8] *See Florida v. Bostick,* 501 U.S. at 436, 111 S.Ct. 2382; *INS v. Delgado,* 466 U.S. 210, 218, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)(no seizure because, even though workers were not free to leave building without being questioned by INS agents, the agents *conduct* gave workers "no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer"). As set forth above, under the relevant Fourth Amendment tests, *none* of the circumstances alluded to by the plurality would have communicated to a reasonable person that he was not free to depart. Thus, the "cumulative effect" of these circumstances, which can be no greater than the sum of the individual circumstances, was similarly insufficient to communicate to a reasonable person that he was not free to depart. Since the actions of the officers did not communicate the requisite coercion, this particular encounter did not amount to an "investigative detention" as that term is properly understood under the Fourth Amendment.

## II

Even if this encounter *had* amounted to an investigative detention under the Fourth Amendment, the suppression court properly determined that the officers had articulated sufficient facts to justify their asserted "reasonable suspicion"

8. In any event, the plurality ignores the fact that the driver obviously "felt" free to simply say "no" in response to the question of whether there was anything illegal in the car, since that is precisely what he said the first time the question was asked, with no adverse ramifications.

that criminal activity was afoot. This Court's scope of review of a suppression court's findings of fact is limited to whether those findings are supported by the record. *See Commonwealth v. Crompton,* 545 Pa. 586, 682 A.2d 286 (1996). We are bound by a suppression court's findings of fact "if they are supported by competent evidence." *See Commonwealth v. Logan,* 519 Pa. 607, 619, 549 A.2d 531, 537 (1988).

An investigative detention is warranted when officers can articulate a reasonable suspicion that criminal activity is afoot. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This test inevitably requires the interests of the government to be balanced against the nature and quality of the intrusion on the individual's Fourth Amendment interests; thus, the extent of the intrusion will always be a factor in determining the level of reasonable suspicion required. *See New York v. Class,* 475 U.S. 106, 117–118, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986); *see also Terry v. Ohio, supra,* 392 U.S. at 20, 88 S.Ct. 1868 (inquiry is whether officer's action was reasonably related in scope to the circumstances which justified the interference in the first place).

In *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605, (1985), a Drug Enforcement Agent ("DEA") was on patrol in an area under surveillance for suspected drug trafficking. The agent observed a blue pickup truck with an attached camper shell driving in tandem with another automobile and decided to follow the two vehicles. Observing that the truck was riding low in the rear, the agent concluded that it was heavily loaded. After following the vehicles for twenty miles and observing them exceed the posted speed limit on a campground road by twenty to twenty-five miles per hour, the Agent radioed to a state trooper who had joined him in following the two vehicles to signal the vehicles to stop. The trooper pulled alongside the automobile and motioned the driver to stop; meanwhile, the truck continued driving, almost cutting off the state trooper's car in the process.[9]

---

**9.** The Court did not speculate as to whether the truck driver intended to elude the police car, but stated that its conclusion would not be any different if it could safely be inferred that the driver was *not* acting

The DEA agent stopped the automobile, while the state trooper followed the truck and stopped it about one-half mile down the road. After stopping the truck, the trooper asked the driver for his license and registration. The driver produced his license and a bill of sale for the truck bearing the name of someone else. In response to questions concerning the ownership of the truck, the driver stated that it belonged to a friend and that he was taking it to have its shock absorbers repaired. The trooper subsequently told the driver that he would be held until the arrival of the DEA agent. At this point, the driver, appearing nervous, stated that he wanted to leave and requested the return of his license. The trooper replied that he was not free to leave at that time.

Approximately fifteen minutes later, the DEA agent arrived. After reviewing the truck driver's documentation and noting that the name on the bill of sale matched the name on the license proffered by the automobile driver, the agent told the truck driver that he thought the truck contained marijuana. The agent twice sought permission to search the truck, and the driver twice declined. Finally, the agent put his nose against the rear window of the truck and reported that he could smell marijuana. Without seeking permission, the Agent removed the keys from the ignition, opened the rear of the camper, and observed a large number of burlap-wrapped bales resembling similar bales of marijuana that he had seen on previous occasions.

The United States Supreme Court granted review in order to determine whether the officers' action was justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *Id.* at 682, 105 S.Ct. 1568. The Court first determined that there was an abundance of evidence in the record to support the lower court's determination that the officers had an articulable and reasonable suspicion that the vehicles were being used in marijuana trafficking. *Id.* Next, the Court concluded that the twenty-minute detention of the truck driver

evasively by continuing to drive the truck after the car was stopped. *See id.* at 687 n. 6, 105 S.Ct. 1568.

was reasonable under the circumstances which justified the interference in the first place. *Id.* at 683, 105 S.Ct. 1568.

In this matter, in light of the extremely limited nature of the putative "investigative detention," the trial court properly determined that the evidence in the record was more than sufficient to sustain a reasonable belief that criminal activity was afoot. The trial court, as it was entitled to do, credited Officer Roehm's testimony at the suppression hearing. This testimony established, *inter alia*, that the stop occurred at 12:22 a.m., that the TransAm had dealer's tags, that it contained boxes of motorcycle parts in the back seat,[10] that the two individuals in the car were more nervous than most people on traffic stops, and that the driver, who had a gang tattoo under his left eye, proffered an expired driver's license and registration papers that did not match the vehicle. See Opin. at 9 (R. at 110a; also at 32a–38a). Considered in the aggregate, these circumstances lent far greater credence to the reasonableness of Officer Roehm's suspicions of criminal activity than the circumstances that gave rise to the agent's suspicions in *Sharpe*. In *Sharpe*, the DEA agent merely observed two vehicles which were exceeding the speed limit, one of which was a truck pulling a weighed-down camper whose driver appeared nervous after he was stopped and who failed to produce a bill of sale in his name. Here, before asking his one question, Officer Roehm similarly identified the driver's extreme nervousness and inability to produce satisfactory documentation, but *further* identified the dealers' tags as well as items and activity *within* the TramsAm which, based on his law enforcement experience, heightened his suspicions.

10. The plurality challenges whether the trial judge properly inferred that the motorcycle parts were one of the circumstances that gave rise to a reasonable suspicion of criminal activity afoot. *See* Plur. Op. at 646–47 n. 4. The plurality's skepticism is based on what it evidently has determined to be an effective cross-examination of Officer Roehm with respect to the explanation provided by the driver for the motorcycle parts. However, under the standard by which we review a suppression court's findings of fact, the trial judge did not abuse his discretion by finding that Officer Roehm reasonably doubted the explanation provided by appellee for the existence of the motorcycle parts. *See Crompton, supra* ; *Logan, supra.*

Moreover, the "nature and quality of the intrusion on the driver's Fourth Amendment interests"[11] in this matter is negligible when contrasted with the intrusion at issue in *Sharpe*. In *Sharpe*, the defendant was detained *against his will* for a period of twenty minutes and subjected to a search of his truck in spite of his express refusal to grant permission for such a search. Here, the officer asked one simple, straightforward question, occupying all of several seconds, which appellee answered in one word. But for appellee's subsequent *invitation* to search the vehicle, this single question may have been the end of the encounter.

## III

In sum, the Fourth Amendment does not afford appellee any relief. In light of United States Supreme Court precedent, the single question posed by Officer Roehm did not amount to an "investigative detention." In this respect, I reiterate the sensible concern that has partially driven the decisions of the United States Supreme Court in this area. Namely, if a single question amounts to an investigative detention, then any police inquiry, no matter how courteously made, would permit a criminal to defeat prosecution by voluntarily revealing all of the evidence against him and then contending that he acted only in response to an implied assertion of unlawful authority. *See Schneckloth v. Bustamonte, supra,* 412 U.S. at 231, 93 S.Ct. 2041.

Further, even assuming *arguendo* that the officer had initiated an investigative detention, there would *still* be no Fourth Amendment violation, since Officer Roehm had a reasonable belief that criminal activity was afoot under the prevailing tests. The Court's error in this part of the case is a result of its failure to appreciate the principles that drive the distinction between the "reasonable suspicion" required for an investigative stop and the "probable cause" required for an arrest. In an investigative stop, the intrusiveness of the police conduct at

11. *See New York v. Class, supra,* 475 U.S. at 117–18, 106 S.Ct. 960.

issue is comparatively negligible. The police are not seeking to strip the subject of his liberty and bring him to trial. Indeed, they do not seek to assert any authority whatsoever over the subject. Instead, they seek merely to ask questions of the subject—here, a single question. An individual may well be annoyed by having to answer a question—especially if that individual is trying to hide some criminal conduct—but police officers do not intrude on any deeply ingrained notion of liberty simply by posing a question to an individual. As noted in another context by Justice Harlan, "[P]eaceful interrogation is not one of the dark moments of the law." *Miranda v. Arizona*, 384 U.S. 436, 517, 86 S.Ct. 1602, 16 L.Ed.2d 694 (Harlan, J., dissenting). That is why the standard of "reasonable suspicion" required for an investigative stop is far less exacting than the standard of "probable cause" for an arrest, which is itself far less exacting than the necessary "proof beyond a reasonable doubt" required to convict.[12] These different standards are driven by the vastly different levels of intrusion that are implicated by investigative stops, arrests, and finally by convictions.

Consequently, both parts of the plurality's opinion in this matter amount to misapplication of, if not wanton disregard for, the United States Supreme Court's binding interpretation of the scope of the Fourth Amendment. It is abundantly clear that the driver's consent to search the vehicle, which led to the frisk of appellee's outer clothing, was not tainted by any prior illegality. Accordingly, I would reverse the Superior Court.

This Opinion in Support of Reversal is joined by Justice NEWMAN.

12. Even within the category of investigative stops, there are two types of police-citizen encounters, of which the one at issue here is decidedly less intrusive. First, there is the limited "Terry pat-down," which must be supported by a reasonable suspicion that the individual is armed and dangerous, since it involves a heightened degree of intrusion. At issue in this matter, however, is the "Terry stop" for purposes of asking questions, which merely requires the aforementioned reasonable suspicion that criminal activity is afoot. *See Terry, supra,* 392 U.S. at 24, 88 S.Ct. 1868.

## OPINION IN SUPPORT OF REVERSAL

CAPPY, Justice.

I join in Part I of Mr. Justice Castille's Opinion in Support of Reversal and write separately in order to specifically disassociate myself with Part II.