COMMONWEALTH OF
PENNSYLVANIA,
Appellee,

v.

James Leonard MURPHY, Appellant.

Superior Court of Pennsylvania.

Submitted Sept. 24, 2001.
Filed March 22, 2002.

William Costopoulos, Lemoyne, for appellant.

Francis T. Chardo, Assistant District Attorney, Harrisburg, for Commonwealth, appellee.

Before: DEL SOLE, P.J., JOHNSON, J. and CERCONE, P.J.E.

OPINION BY DEL SOLE, P.J.

¶ 1 Following a jury trial, Appellant James Leonard Murphy was convicted of various violations of the Wiretap Act and related crimes. He was sentenced to 12 months' probation plus fines and costs. This direct appeal followed. We affirm.

¶ 2 The charges arose after it was discovered that Appellant had placed an illegal wiretap on his girlfriend's telephone. On this appeal, Appellant raises the following issues.

A. WHETHER THE JUDGMENT OF SENTENCE MUST BE VACATED AND APPELLANT DISCHARGED BECAUSE HE WAS SELECTIVELY PROSECUTED IN VIOLATION OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS?

B. WHETHER THE VOICE IDENTIFICATION OF APPELLANT AND ALL FRUITS OBTAINED THEREBY, INCLUDING THE EVIDENCE SEIZED FROM THE SIX SEARCH WARRANTS EXECUTED, SHOULD HAVE BEEN SUPPRESSED BECAUSE THE POLICE VIOLATED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS BY FAILING TO OBTAIN A SEARCH WARRANT TO PLAY THE CASSETTE TAPE AFTER SEIZING IT WITHOUT A WARRANT?

C. WHETHER THE AFFIDAVITS IN SUPPORT OF THE SIX SEARCH WARRANTS WERE FATALLY DEFECTIVE IN THAT THEY CONTAINED A CRITICAL MATERIAL MISREPRESENTATION OF FACT ATTRIBUTED TO APPELLANT'S GIRLFRIEND WHICH RENDERED THEM INVALID UNDER THE TOTALITY OF THE CIRCUMSTANCES TEST?

Appellant's Brief at 6.

¶ 3 The trial court, in its August 30, 2001, opinion accurately sets forth the facts and procedural history as follows:

Susan Egolf, property manager of East Park Garden Apartments, testified that in April of 2000, the appellant resided in Apartment 202, of 229 Francis Cadden Boulevard. (N.T. 26). The residents of each of the twenty-two apartments within the building, the employees of three management companies, and the utility companies all had keys to the common storage area. (N.T. 26–27). On April 9, 2000, Stacy Eichelberger was doing laundry in the basement [of] her building in East Park Garden Apartments, when she heard voices coming from the storage room located across the hall from the laundry room. (N.T. 19–20). She used her key to enter the storage room, but did not see anything. (N.T. 20). She heard the voices again and notified her neighbor John Fox. (N.T. 20–21). They determined that the voices were coming from the telephone box. (N.T. 21). Mr. Fox removed the panel from the telephone box and they discovered a recorder. (N.T. 21).

Ms. Eichelberger called the Swatara Township Police Department and Officer Russell Taylor responded to the call and took custody of the recording device. (N.T. 10, 21, 24). Officer Taylor made a crime report which was reviewed by Sergeant Robert Simmonds of the Swatara Township Police Department. (N.T. 10). Ten days after the discovery

of the tape recorder, Sergeant Simmonds referred the case to Captain John Brown of the Pennsylvania State Police, Bureau of Professional Affairs (BPA), and they listened to the tape recording. (N.T. 10). Captain Brown identified one of the voices as James Murphy, a uniform patrol supervisor with Troop H of the Pennsylvania State Police (PSP). (N.T. 10).

On April 21, 2000, Sergeant Simmonds informed the District Attorney's Office of the nature of the investigation. (N.T. 11–12). On April 24th, Sergeant Simmonds called Debra Porter. (N.T. 13). Sergeant Simmonds testified that initially Ms. Porter indicated that she did not know who would have placed a recorder on her phone, but subsequently she stated that she believed that it may have been the appellant who placed a recorder on her phone. (N.T. 13). However, Ms. Porter indicated that she did not want to prosecute this matter. (N.T. 13, 17).

On April 28, 2000, Sergeant Garret Rain with the BPA and Trooper Robert Clark obtained permission from Ms. Egolf to process the telephone box for fingerprints. (N.T. 33–34). On May 16, 2000, Corporal Robert Mgrich obtained search warrants for the appellant's person, his personal and PSP vehicle, his residence, his credit background, and sales records from Radio Shack. (N.T. 55). Following the investigation, the Dauphin County District Attorney's Office authorized the filing of criminal charges in this matter.

On December 4, 2000, appellant filed an omnibus pretrial motion raising a motion to dismiss for selective prosecution, a motion to suppress physical evidence, and a motion to suppress the voice identification. A pre-trial hearing was held before this court on January 29, 2001. At the conclusion of the hearing, both parties were directed to file briefs. On February 2, 2001, this court filed an order denying appellant's omnibus pretrial motion.

Following a jury trial from February 5—7, 2001, appellant was convicted of four counts of interception, disclosure or use of wire, electronic or oral communications; one count of possession of electronic device; one count of manufacture of electronic device; one count of criminal use of a communication facility; and one count of unlawful possession of an instrument of a crime. On March 29, 2001, this court sentenced the appellant to pay the costs of prosecution and a fine of $100 on each of the eight charges, and serve an aggregate term of county probation for twelve months.

Trial Court Opinion, 8/30/01, at 1–3.

 ¶ 4 Appellant first claims that he was selectively prosecuted for his crimes in violation of his constitutional rights. In order to establish a *prima facie* case of selective prosecution, Appellant must establish, first, that others similarly situated were not prosecuted for similar conduct, and, second, that the Commonwealth's discriminatory prosecutorial selection was based on impermissible grounds such as race, religion, the exercise of some constitutional right, or any other such arbitrary classification. *Commonwealth v. Mulholland*, 549 Pa. 634, 702 A.2d 1027 (1997); *Commonwealth v. Rickabaugh*, 706 A.2d 826 (Pa.Super.1997). The burden is on the defense to establish the claim; it is error to shift the burden to the prosecution to establish or refute the claim. *Mulholland*, 702 A.2d at 1034. Because of the doctrine of separation of powers, the courts will not lightly interfere with an executive's decision of whom to prosecute. *Commonwealth v. Wells*, 441 Pa.Super. 272, 657 A.2d 507 (1995).

¶ 5 At the pretrial hearing on Appellant's motion to dismiss for selective prosecution, the prosecutor set forth the cases

which had been brought to his attention by defense counsel as follows:

[MR. CHARDO:] I will say this, that I was only aware of one of them at the time of the prosecution decision. I will note that as I go through them. The first case involved one Major Harry A. Crytzer, C–R–Y–T–Z–E–R, and this related to an allegation that occurred back in February of 1998 and it was in Dauphin County and it occurred at the State Police headquarters and the facts, as I understood them, in this case Major Crytzer had an office in the departmental headquarters and and [sic] would keep a tape recorder running in his desk when he would leave, and as I understand, the reason he did this is he had a habit of not being in the office a lot and he wanted to be able to tell when the Commissioner called for him, so that he could say, well, I was here or whatnot. And there were conversations that were picked up as a result, and there was an allegation brought and a request for prosecution. That prosecutorial decision was not made by the Dauphin County D.A.'s Office but was made by the Deputy Attorney General, Eric Noonan, and he elected not to prosecute and I am not aware of the exact analysis he entered into to make that decision. And Mr. Noonan is now deceased.

The second case, which was brought to my attention by Mr. Costopoulos, relates to Chief Charles Gullick of the Dauphin Borough Police Department which is, for the record, a one-man police department. I believe it was at the time of the allegation, the allegation was three or four years ago and that was the one of which I was aware and this related to the surreptitious tape-recording of traffic stops. Apparently Chief Gulllick [sic] had a tape recorder he would keep with him and keep activated when he had a traffic stop and would record without the motorist knowing they were be-ing recorded and he admitted doing this, allegedly he did not know it was unlawful and gave a reason that he wanted to have, in case they make some allegation against him that he would have a record of the transaction. That charging decision was made by the Attorney General's Office. It was originally in the Dauphin County D.A.'s office and there was a conflict to the Attorney General, and the Attorney General's Office elected not to prosecute that case. I am not sure of the exact reason. It was the finding, it was a conclusion that was a deminimus infraction, but they elected not to prosecute. And the third case brought to my attention involves Trooper Charles McBreen, M–C–B–R–E–E–N, who was at the time I believe, and there is an allegation that occurred within the last several years, was operating out of the Jonestown Barracks of the State Police, but he was on the Tasc service and involved in the organized crime unit and that took him all over the eastern part of the state.

The allegation there was that he was participating in a wiretaping, unlawful wiretapping involving organized crime. I should note that one of the police officers I believe he was the only one who had wiretap training, and he had taken the tape-recordings of some of those interceptions and he illegally played them for a female acquaintance and so it was a disclosure violation.

A decision on whether or not to charge him, as I understand it, has not yet been made and is pending before the Lebanon county and Philadelphia County District Attorney's Office. None of his actions, as I understood, occurred in Dauphin County.

N.T., 1/29/01, at 4–6.

¶ 6 Thereafter, defense counsel stated that there was "a fourth one that we have determined, who it was not in Dauphin

County, Pennsylvania State Police Officer Mark Heff." *Id.* at 8. Counsel gave no further information on the Heff case. Counsel then called one witness, Swatara Township Police Officer Robert W. Simmonds. Officer Simmonds testified to his discussion with Ms. Porter regarding her desire not to prosecute Appellant in this matter, as well as discussions with the State Police regarding pursuing the matter only internally if Ms. Porter did not want to prosecute. Also, at sentencing, Appellant renewed his motion and counsel advised the court of the case of Dennis Rodriques, a Hispanic state police officer out of either Philadelphia or Montgomery County, whose case was handled internally resulting in a 15–day suspension.

¶ 7 In rejecting Appellant's claim, the trial court stated:

When considering the totality of the evidence presented at the pre-trial hearing, this court found that the appellant failed to show that he was prosecuted for any reason other than his violations of the Criminal Code. The record indicates that Attorney Chardo did not have any knowledge of appellant's race when he reviewed the merits of the case and made the determination to file charges. Additionally, the Dauphin County District Attorney's Office was not involved in the decision not to prosecute the charges against Major Crytzer and Chief Gullick. Furthermore, the specific facts in this case which involved the use of a hard wire by a wiretap certified police officer make it distinguishable from the allegations against the other officers. Accordingly, this court found that the appellant failed to establish that he was a victim of selective prosecution and denied appellant's request to dismiss the informations on this basis.

Trial Court Opinion, 8/30/01, at 6–7.

 ¶ 8 We agree with the trial court that the evidence presented was insuffi-

cient to establish selective prosecution. First, Appellant failed to prove that other officers similarly situated were not prosecuted. In the two cases where the prosecuting authority declined to file charges against the officers, *i.e.*, Major Crytzer and Chief Gullick, neither officer employed police wiretap training to perpetrate their alleged crimes, while Appellant, in fact, made use of his specialized police training. In the case of Trooper McBreen, he disclosed information that he obtained via a valid wiretap to his paramour. Once again, he did not use his technical training to wiretap someone illegally. Moreover, the information before the court was that no decision had yet been made on whether or not to charge McBreen; since it was possible that McBreen could still have been charged, his case does not support Appellant's claim at all. As to Trooper Neff, there is no information in the record regarding what his alleged violation was or whether he was eventually prosecuted. Finally, as to Trooper Rodriques, while his case is similar to Appellant's, it was not known to the parties until after the conclusion of Appellant's trial, and it is not clear from the record whether his case even occurred prior to the Dauphin County District Attorney's decision to prosecute Appellant. Therefore, it too has no evidentiary value regarding the question of whether, at the time the District Attorney of Dauphin County decided to prosecute Appellant, he was singled out from other similarly situated police officers.

¶ 9 Moreover, we agree with the trial court that Appellant failed to prove that his prosecution was racially motivated. Deputy District Attorney Chardo stated he did not know the race of Appellant when he made the decision to prosecute, and he expressed specific, non-invidious reasons for filing charges against Appellant, including Appellant's use of his specialized police training in violating the Wiretap Act. Ap-

pellant's bald assertion that, since four white officers were not prosecuted for violations of the Wiretap Act (a fact, we note, which is not clearly established in the record), Appellant's prosecution must be racially motivated because he is African–American, ignores two important points. First, the Dauphin County District Attorney's Office was not involved in any of those other prosecutorial decisions. Thus, a pattern of bias in favor of white officers cannot be imputed to it based upon the actions of other prosecuting authorities. Second, despite Appellant's protestations to the contrary, the record supports the trial court's finding that Attorney Chardo did not know Appellant's race prior to making the decision to prosecute. Accordingly, we find that the trial court properly concluded that Appellant was not selectively prosecuted because of his race.

¶ 10 Next, Appellant contends that a search warrant was needed before the police could play the cassette tape inside the recorder which they seized without a warrant and that all evidence subsequently seized as a result of playing the tape without a warrant must be suppressed. Appellant does not dispute that the police were entitled to seize the cassette tape recorder and the audio tape inside it without a warrant. Rather, relying on *Commonwealth v. Parker*, 422 Pa.Super. 393, 619 A.2d 735 (1993) and *Commonwealth v. Timko*, 491 Pa. 32, 417 A.2d 620 (1980), he argues that the police could not listen to the audio tape without a warrant issued by a neutral, detached judicial officer based upon a finding of probable cause. Basically, he argues that he had a reasonable expectation of privacy in the contents of the audio tape, and his voice identification and all evidence obtained as a result thereof should have been suppressed in accordance with Article I, Section 8 of the Pennsylvania Constitution and the Fourth and Fourteenth Amendments to the United States Constitution.

¶ 11 Appellant submits that *Parker* is directly on point. In that case, Police Officer Milligan stopped Parker as he drove his vehicle out of a gas station. The officer suspected that Parker did not have a valid driver's license. Officer Milligan testified that after stopping Parker and verifying that he did not have a valid driver's license, he asked Parker if he could search the vehicle for "drugs or other contraband" or for "drugs and other violations of the law." Officer Milligan asked for permission to search the vehicle because at some point in the past, he had assisted in arresting Parker for a drug-related offense. Officer Milligan testified that Parker consented to the search.

¶ 12 At the time of the consent, there were four armed police officers at the scene. Trooper Kern conducted the search of the automobile which revealed no drugs. During the search, however, Trooper Kern found a cassette tape recorder, containing a tape, under the driver's seat. Kern confiscated the audio tape, but not the cassette recorder.

¶ 13 Eventually, Parker was charged with violating the Wiretapping and Electronic Surveillance Act. Parker sought suppression of the tape on the grounds that his consent to search the vehicle was not voluntary. Parker further argued that even if his consent was valid, the seizure of the tape was beyond the scope of the consent and beyond the parameters of the plain view doctrine. Finally, he argued that, regardless of the legality of the seizure of the tape, the playing of the tape was a separate search which required the police to obtain a warrant prior to playing the tape.

¶ 14 Upon review, we held that while the initial stop of Parker's vehicle was proper, his continued detention after the issuance of a citation for driving without a license was an illegal seizure since the officer

lacked reasonable suspicion to suspect any other criminal activity. Thus, Parker's consent to search was the product of an illegal seizure and any evidence obtained as a result thereof should have been suppressed. *Parker*, 619 A.2d at 738–739.

¶ 15 We then went further and remarked that even if Parker's consent was voluntary, the tape recorder and cassette tape were clearly beyond the scope of the consent. *Parker*, 619 A.2d at 739. The Commonwealth responded that the tape was in plain view. We rejected that argument holding that there was nothing about the cassette tape which would give rise to the probable cause necessary to seize the tape under the plain view doctrine. *Parker*, 619 A.2d at 740. Therefore, the warrantless examination of the tape was improper.

¶ 16 Finally, we addressed Parker's argument that even if the seizure of the tape was proper, a separate warrant was necessary for the playing of the tape, since that amounted to a separate search. We also agreed with that argument, stating:

> Parker directs us to our supreme court's holding in *Commonwealth v. Timko*, 491 Pa. 32, 417 A.2d 620 (1980), to support his assertion that a separate search warrant was required before the police could listen to the tape. In that case, the police lawfully arrested Timko. The police then performed an automobile search incident to arrest. During their search, the police removed a zippered valise from Timko's car and searched it. Timko challenged the search of his valise claiming that in order for the police to open his valise and search it, a separate search warrant was required. Our supreme court agreed and held that once the valise was reduced to the custody of the police, there was neither danger to police officers nor

an exigent circumstance which could justify the immediate search of the closed container. *Id.* at 39, 417 A.2d at 623. There, the court stated that the valise could not be searched without a warrant simply because it had been seized from an automobile. *Id.*

> The rationale in *Timko* is persuasive. There, the valise was lawfully seized pursuant to arrest. However, without a search warrant, the police were prohibited from searching within the valise where the appellant had a reasonable expectation of privacy. *Timko*, at 38, 417 A.2d at 623. The Commonwealth, here, claims that the tape was validly seized, either pursuant to the plain view doctrine or Parker's consent. However, even if the seizure of tape were valid, if *Timko* is applied, accessing the contents of the tape in which Parker had a reasonable expectation of privacy, required a separate search warrant.

*Parker*, 619 A.2d at 740–741.

¶ 17 Unfortunately for Appellant, his reliance on *Parker* and similar cases such as *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) is misplaced.[1] In those cases, the defendants had a legitimate expectation of privacy in the contents of the audio tape and films. Thus, the playing of those media constituted a separate search which required a warrant. In the present case, however, Appellant had an expectation of privacy in neither the cassette tape nor its contents.

¶ 18 In *Commonwealth v. Torres*, 564 Pa. 86, 764 A.2d 532 (2001), our Supreme Court stated:

[U]nder Pennsylvania law, ... the traditional formulation for standing to contest a search based on an alleged violation of privacy rights under Article I,

---

1. *Walter* involved the viewing of films without a warrant, even though the boxes which housed the films were properly in police custody.

Section 8 of the Pennsylvania Constitution is satisfied when a defendant demonstrates that he has a proprietary or possessory interest in the premises searched. *Commonwealth v. Peterkin*, 511 Pa. 299, 309, 513 A.2d 373, 378 (1986). However, having standing based on a proprietary or possessory interest in the premises searched merely entitles a defendant to an adjudication of the merits of his/her suppression motion. *Commonwealth v. Peterson*, 535 Pa. 492, 497–98, 636 A.2d 615, 617–18 (1993). In order to actually prevail on such a motion, the defendant must also separately demonstrate that he had a subjective expectation of privacy in the premises at the time of the search and that such an expectation is objectively reasonable, i.e., that he had a legitimate expectation of privacy. *Id.* at 498, 636 A.2d at 618.

*Torres*, 764 A.2d at 541–42 (footnotes omitted).

▮▮▮▮ ¶ 19 To have a reasonable expectation of privacy, one must intend to exclude others and must exhibit that intent. *Commonwealth v. Lowery*, 305 Pa.Super. 66, 451 A.2d 245, 248 (1982); *Commonwealth ex rel. Cabey v. Rundle*, 432 Pa. 466, 248 A.2d 197 (1968); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The expectation of privacy must not only be "actual (subjective,)" but also one that "society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). "[I]n determining what is 'reasonable,' all the surrounding facts and circumstances must be considered." *Commonwealth v. Latshaw*, 481 Pa. 298, 306, 392 A.2d 1301, 1305 (1978), *cert. denied*, 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979).

¶ 20 In *Lowery* we stated:

The law is settled that a warrantless search may be made with the voluntary consent of a third party who possesses "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 168, 172, 94 S.Ct. 988, 991, 993, 39 L.Ed.2d 242 (1974).

Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third party consent does not rest upon the law of property, with its attendant historical and legal refinements, . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, supra, 415 U.S. at 173, n. 7, 94 S.Ct. at 993; *Commonwealth v. Garcia*, 478 Pa. 406, 387 A.2d 46 (1978).

Where such joint access or control exists, there can be no reasonable or legitimate expectation of privacy. *Latshaw*, supra.

*Lowery*, 451 A.2d at 248.

¶ 21 Presently, Appellant cannot demonstrate any legitimate expectation of privacy in the audio tape or its contents. The tape was found inside an unlocked telephone junction box which was located inside a storage room in Appellant's apartment building. The residents of twenty-two separate apartments, the employees of the apartment complex management company and the utility companies all had keys to the storage room. Ms. Eichelberger, a resident of the apartment building, discovered the tape recorder and cassette, alerted the police, and consented to their seizure of the items. Clearly, joint control

over the cassette tape and its contents existed, and thus, Appellant had no legitimate expectation of privacy in the tape or its contents.

¶ 22 Therefore, *Parker* and *Walter* are readily distinguishable from the present case. Unlike in *Parker* and *Walter,* where the defendants clearly had legitimate expectations of privacy in the contents of the cassette tape and film played by the police, Appellant had no such legitimate expectation of privacy in the cassette tape or its contents. Appellant left the cassette tape in an area over which a large number of people had common authority, and he had effectively abandoned the tape. Thus, a warrant to listen to the tape was not necessary, and the trial court properly denied Appellant's suppression motion.

¶ 23 Finally, Appellant complains that the affidavits in support of the six search warrants were fatally defective in that they contained a critical material misrepresentation of fact attributed to Appellant's girlfriend. Appellant argues that, due to this defect in the warrants, all evidence resulting therefrom must be suppressed. These affidavits all averred in pertinent part:

> As part of this investigation, Sergeant SIMMONDS documented that he spoke with Debra PORTER of 223 Francis L. Cadden Parkway, Apt. 202, Harrisburg, PA 17111. When informed by Sergeant SIMMONDS that a wiretap had been placed on her telephone, Ms. PORTER was surprised. This was not something she had authorized, or knew about. She also conceded to Sergeant SIMMONDS that James MURPHY, her live-in boyfriend, probably did this to check up on her.

Trial Court Opinion, 8/30/01, at 10. At the suppression hearing, Ms. Porter denied ever telling Sergeant Simmonds or any other police officer that Appellant "probably did this to check up on her."

¶ 24 The totality of the circumstances test is employed to determine whether an affidavit of probable cause sets forth sufficient facts for the necessary finding of probable cause to support a search warrant and, "if a search warrant is based on an affidavit containing deliberate or knowing misstatements of material fact, the search warrant is invalid." *Commonwealth v. Clark,* 412 Pa.Super. 92, 602 A.2d 1323, 1325 (1992).

¶ 25 Presently, Appellant claims that the warrants are invalid because Ms. Porter denied that she told Sergeant Simmonds that Appellant probably set up the wiretap to check up on her. However, Sergeant Simmonds also testified at the suppression hearing. He stated that he discussed the matter with Ms. Porter and, while she initially had no idea who would have placed a tape recorder on her telephone, she "acquiesced to the idea that it was perhaps [Appellant]." N.T., 1/29/01, at 13. It is worth noting that Ms. Porter was clearly biased in favor of Appellant and repeatedly indicated to all involved in this case that she did not want Appellant to be prosecuted. *See e.g.,* N.T., 1/29/01, at 17.

¶ 26 Thus, the suppression court was faced with two distinct versions of the facts surrounding the affidavit of probable cause. Given Ms. Porter's clear bias in favor of Appellant, the suppression court determined that Sergeant Simmonds was telling the truth when he indicated that Ms. Porter conceded that Appellant probably placed the wiretap to check up on her. "In reviewing a suppression court's ruling, we are bound by those factual findings of the suppression court which are supported by the record." *Commonwealth v. Sierra,* 555 Pa. 170, 723 A.2d 644, 645 (1999). Since the trial court's determination of fact with regard to Ms. Porter's statement to Sergeant Simmonds is supported by the record, we conclude that there was not a

material misrepresentation of fact in the affidavit of probable cause which would render it fatally flawed.

¶ 27 Accordingly, as we have found no merit to Appellant's claims, we affirm the judgment of sentence.

¶ 28 Judgment of sentence affirmed.