J-S15019-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ROMARIO REGINALD BROWN | : | |
| | : | |
| Appellant | : | No. 1396 EDA 2025 |

Appeal from the Judgment of Sentence Entered February 14, 2024
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0005521-2022

BEFORE: OLSON, J., MURRAY, J., and STEVENS, P.J.E.*

MEMORANDUM BY MURRAY, J.: **FILED JUNE 9, 2026**

Romario Reginald Brown (Appellant) appeals, *nunc pro tunc*, from the judgment of sentence entered following his conviction of possession of a firearm without a license, a first-degree misdemeanor.[1] Appellant challenges the denial of his pre-trial motion to suppress evidence. After careful review, we affirm.

The trial court summarized facts underlying this appeal:

On November 8, 2022, Pennsylvania State Police [(PSP)] Trooper Matthew Dwyer [(Trooper Dwyer)] observed a red 2013 Chevrolet Camaro traveling 92 [miles per hour (MPH)] in a 55 MPH zone[,] while conducting radar speed enforcement. Stipulation, 1:1-2. The Camaro accelerated away[, in an attempt to elude the troopers,] and passed a vehicle in the left shoulder on two occasions, without using a turn signal. ***Id.*** at 1-3. A traffic stop

---

* Former Justice specially assigned to the Superior Court.

[1] ***See*** 18 Pa.C.S.A. § 6106(a)(2).

was conducted on the Camaro at Mile Marker 7.2 in Ridley Township. *Id.* at 1:4. The operator … was removed from the vehicle and identified as [Appellant]. *Id.* at 1:5. Responding troopers began speaking with [Appellant], inquiring why he had eluded the police[,] and if the reason he ran was because there was anything illegal in the vehicle. … [Motor Vehicle Recording] Stream 0 at 8:50. When Trooper Dwyer asked [Appellant] for consent to search [his vehicle], [Appellant] continuously refused to give an affirmative yes or no [answer]. N.T., 3/22/23, at 11. Trooper Dwyer testified [that] in the approximately 2,000 traffic stops he has conducted, about 200 of those involved requesting consent to search a vehicle. [N.T., 5/25/23, at 11.] When asked [in] how many of those incidents was [the] suspect nonresponsive like [Appellant] was, Trooper Dwyer indicated almost never. [N.T., 3/22/23, at 11.]

[Appellant] admitted that he had a knife in the vehicle and eventually stated that he had a Taurus pistol in [an Adidas bag] inside the vehicle, which Trooper Dwyer had permission to retrieve. Stipulation[,] 2:6; N.T., 3/22/23, at 11. As the car was searched, the following[ items] were found: A tan/black Taurus G3 9[mm] pistol with serial number ACA73000; a removable magazine mounted inside [the pistol] that held 17 rounds of ammunition; and[, in addition,] 21 rounds of 9mm ammunition. Stipulation, 2:7. [Appellant] did not have a valid Pennsylvania License to Carry Firearms. *Id.* at 2:8. Exhibit A.

Trial Court Opinion, 9/3/25, at 1-2 (citations format modified).

The Commonwealth filed a criminal complaint against Appellant on November 11, 2022. On February 1, 2023, Appellant filed a motion to suppress all statements and evidence seized during the motor vehicle stop. Motion to Suppress, 2/1/23. Specifically, Appellant claimed his consent to the search was invalid, as it was coerced during an unlawful custodial detention, and without law enforcement first advising Appellant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). *Id.* ¶¶ 5-7. Appellant claimed

that the firearm recovered during the search was the "fruit of the poisonous tree" and should be suppressed. *Id.* ¶ 7.

The trial court conducted a suppression hearing on March 22, 2023, and May 25, 2023. On July 10, 2023, the trial court entered an order denying Appellant's suppression motion. The matter proceeded to a stipulated bench trial on February 14, 2024, after which the trial court convicted Appellant of possessing a firearm without a license. That same day, the trial court sentenced Appellant to three years of probation. Appellant timely filed a post-sentence motion, which the trial court denied on March 6, 2024. Appellant timely appealed, and filed a court-ordered Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal. However, this Court subsequently dismissed Appellant's appeal based on his failure to comply with Pa.R.A.P. 3517 (requiring the appellant to return a docketing statement to the Superior Court). **Commonwealth v. Brown**, 888 EDA 2024 (Pa. Super. filed Jul. 15, 2024) (order).

Appellant timely filed a Post Conviction Relief Act[2] (PCRA) petition seeking reinstatement of his direct appeal rights, *nunc pro tunc*. The PCRA court granted Appellant's petition on May 7, 2025, reinstating Appellant's direct appeal rights, *nunc pro tunc*. Appellant thereafter timely filed his *nunc*

---

[2] 42 Pa.C.S.A. §§ 9541-9546.

- 3 -

*pro tunc* direct appeal. On September 4, 2025, the trial court filed an opinion addressing the issues raised in Appellant's concise statement.[3]

Appellant presents the following issues for our review:

1. Can a consent for a search that is gotten by constant pressuring, by detaining [Appellant] by refusing to let him leave or even make a phone call, and all done without a **Miranda** warning, [constitute] a non-co[erc]ed consent?

2. Did the [suppression court] err by finding that the doctrine of reasonable suspicion can extend without any limit in time, without an arrest or allowing [] Appellant the option to refuse the search of the Adidas bag?

3. Is a gym bag in the back seat of a car enough to invoke the doctrine of reasonable suspicion?

Appellant's Brief at 5 (issues reordered). We address Appellant's claims together, as they are related.

When reviewing a challenge to a suppression court ruling,

we are limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We review questions of law *de novo* but defer to the suppression court's factual findings when they are supported by the record.

**Commonwealth v. Foster**, 332 A.3d 1187, 1194-95 (Pa. 2025) (internal quotation marks and citations omitted). Our scope of review is limited to the record developed at the suppression hearing, considering the evidence presented by the Commonwealth, as the prevailing party, and any

_____

[3] As stated above, Appellant previously had filed a Pa.R.A.P. 1925(b) concise statement.

- 4 -

uncontradicted evidence presented by Appellant. ***Commonwealth v. Fulton***, 179 A.3d 475, 487 (Pa. 2018).

Appellant first argues that his "consent to search was obtained only through [an] illegal detention and intensive questions, and thus, was not a voluntary consent." Appellant's Brief at 15. Appellant compares the circumstances in this case to those determined to be coercive in ***Commonwealth v. Acosta***, 815 A.2d 1078 (Pa. Super. 2003) (*en banc*). Appellant's Brief at 16. Appellant points out that in ***Acosta***, the following coercive factors were deemed to invalidate the defendant's consent to search:

> (1) The existence of a prior lawful detention; (2) the withholding of vehicular documentation; (3) the presence of other officers and marked police cars with flashing lights in close proximity to the defendant's; and (4) the absence of an express endpoint to the detention in the form of an admonition by the authorities that the defendant was free to leave.

***Id.*** at 16 (punctuation modified) (citing ***Acosta***, 815 A.2d at 1085). Appellant further observes that in ***Acosta***, police never advised the defendant of his ***Miranda*** rights or informed the defendant that he was free to withhold his consent. ***Id.*** at 16-17.

Comparing the instant circumstances to those in ***Acosta***, Appellant claims that although the initial traffic stop was lawful, (1) officers withheld his vehicle documentation during questioning; (2) there were four officers and two marked police cruisers, with lights flashing, in close proximity to him; (3) there was no end point to the detention; (4) officers failed to advise Appellant

of his *Miranda* rights; and (5) officers failed to advise Appellant that he was free to leave. *Id.* at 17.

Appellant points out that during the vehicle stop, he repeatedly told the officers he wanted to go home, and asked Trooper Dwyer if the trooper "had to search the vehicle." *Id.* The trooper responded to this inquiry, "well, if you say no, then we'll go down a different path, but first I gotta ask you …." *Id.* Appellant claims this response indicated that Appellant was not free to leave. *Id.* Appellant additionally points out that Trooper Dwyer refused his request to make a phone call. *Id.* at 18.

In his second issue, Appellant claims the trial court improperly found that the doctrine of reasonable suspicion can extend without limit. *Id.* at 5. In this regard, Appellant argues that an Adidas bag in the back seat "does not create a reasonable suspicion to detain a driver." *Id.* at 13. Appellant further argues that the troopers' discovery of a firearm did not retroactively create "reasonable suspicion" to justify his investigative detention. *Id.* at 14. Appellant compares this case to *Commonwealth v. Malloy*, 257 A.3d 142 (Pa. Super. 2021), wherein we concluded that police unlawfully conducted an additional investigative detention, following a traffic stop, based upon the possession of a firearm by the defendant passenger, a private security worker. Appellant's Brief at 14. Appellant argues that, unlike in *Malloy*, Trooper Dwyer had no concern over his safety, as Appellant had no gun on his person or within his reach. *Id.*

In his third issue, Appellant argues that the presence of the Adidas bag, in the back seat of his vehicle, did not create reasonable suspicion of criminal activity.  *Id.* at 13.  Appellant argues that "[t]he only basis for 'reasonable suspicion' in this matter was an Adidas satchel in the back seat."  *Id.* (emphasis in original).  According to Appellant,

> [t]he only possible "reasonable suspicion" of the bag, was that [Appellant] might be coming from the gym.  That is not a crime, and to consider it one would result in a lot of citizens being unreasonably detained [a]fter coming from a workout.

*Id.* at 14.  Appellant argues that "there is no 'reasonable suspicion' when the police officer … asks numerous times after a traffic stop if the driver had anything illegal in the vehicle."  *Id.* at 13 (citing **Commonwealth v. Sierra**, 723 A.2d 644 (Pa. 1999)).

The Commonwealth disagrees, arguing that Trooper Dwyer's investigative detention was supported by the requisite reasonable suspicion, and not extended beyond its "original mission."  Commonwealth's Brief at 10.  The Commonwealth explains, "Trooper Dwyer's inquiries about potential contraband in the vehicle were related to the original purpose" of the traffic stop.  *Id.*  According to the Commonwealth, Troper Dwyer had probable cause to initiate a traffic stop based upon Appellant's speeding and evasive driving.  *Id.*

The Commonwealth asserts that Trooper Dwyer's line of questions regarding the presence of illegal contraband within the vehicle "was to

investigate why Appellant attempted to evade police[.]" *Id.* According to the Commonwealth,

> the purpose of the traffic stop was two-fold: to investigate the initial speeding infraction, and to investigate why Appellant attempted to evade police by accelerating and passing vehicles on the shoulder in a construction zone[,] after police pulled onto the highway. Trooper Dwyer testified, " … it wasn't a routine[, "we] got him [speeding] on radar, and he pulled over on the shoulder and we gave him a ticket." Appellant] was passing cars on the shoulder trying to evade a traffic stop." N.T., 5/25/23, [at] 15[.]….

*Id.* at 11-12. The Commonwealth directs our attention to Trooper Dwyer's testimony that he asked Appellant, "is there anything illegal in the vehicle, is that why you're running[?]" *Id.* at 12 (quoting Ex. C-1, "Dwyer Vehicle," 00:09:10; Ex. C-2, "Darcangelo Vehicle," 00:06:46). The Commonwealth argues Trooper Dwyer's questions were "relevant" to the basis for the traffic stop—investigating "not only the speeding but why Appellant attempted to evade the traffic stop by speeding up and passing cars on the shoulder." *Id.* at 13.

The Commonwealth maintains the trooper did not unnecessarily prolong the traffic stop, as the questions were posed to Appellant while the troopers were "still verifying Appellant's documentation, which is routine for any traffic stop." *Id.* The Commonwealth claims that when Trooper Dwyer first requested consent for the search, Appellant "was still in the process of pulling up his insurance information on his phone." *Id.* Thus, the purpose for the traffic stop was still underway. *Id.*

Even if Trooper Dwyer's inquiries exceeded the purpose of the traffic stop, the Commonwealth argues, Trooper Dwyer developed reasonable suspicion to support an extended investigation. *Id.* at 14. The Commonwealth lists the following circumstances that, it claims, would support an extended investigation:

> First, … Appellant passed Trooper Dwyer's vehicle while speeding, [and] he accelerated when Trooper Dwyer pulled onto the highway. After traffic ushered Appellant into a construction zone, [Appellant] continued his evasive driving by passing other motorists on the shoulder in an attempt to get away from the troopers. Then, after Appellant pulled over, the troopers on the scene noticed an opaque satchel bag in Appellant's car. Trooper Dwyer testified he had encountered these types of bags with firearms in them numerous times….

*Id.* The Commonwealth asserts that Trooper Dwyer was entitled to consider the bag "as one factor among many[,] given his knowledge and experience with similar bags." *Id.* The Commonwealth additionally cites Trooper Dwyer's testimony, "I have never seen someone so nervous[.]" *Id.* (quoting Ex. C-1, "Dwyer Vehicle," 00:21:58). The Commonwealth points out Appellant's evasive answers to Trooper Dwyer's questions. *Id.* at 14-15.

The Commonwealth also argues that Appellant voluntarily consented to the search. *Id.* at 15-16. In support, the Commonwealth contends that Appellant was subject to a lawful investigatory detention; and the totality of the circumstances demonstrated Appellant's consent was not the product of coercion or duress. *Id.* According to the Commonwealth, Trooper Dwyer repeatedly requested consent because Appellant would not answer the

question with a "yes or no." *Id.* The Commonwealth cites *Commonwealth v. Mack*, 796 A.2d 967, 970 (Pa. 2002), in support. Commonwealth's Brief at 16-17.

Finally, the Commonwealth disagrees with Appellant's claim that he should have been apprised of his *Miranda* rights. *Id.* at 20. The Commonwealth asserts that Appellant was the subject of an investigative detention, not a custodial interrogation. *Id.*

In examining Appellant's interaction with Trooper Dwyer, we are cognizant that the Fourth Amendment to the United States Constitution, extended to the States via the Fourteenth Amendment, protects against unreasonable searches and seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. Similarly, Article I, Section 8 of the Pennsylvania Constitution protects against unreasonable searches and seizure:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST., art. I, § 8.

As our Supreme Court has explained,

"[u]nder both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, searches conducted in the absence of a search warrant are *per se* unreasonable, unless they satisfy one of the recognized exceptions to the warrant requirement." ***Commonwealth v. Hunte***, 337 A.3d 483, 498 (Pa. 2025) (footnote omitted). ***See also Jones v. United States***, 357 U.S. 493, 498 … (1958) ("The decisions of this Court have time and again underscored the essential purpose of the Fourth Amendment to shield the citizen from unwarranted intrus[ions] into his privacy."); ***Commonwealth v. Edmunds***, … 586 A.2d 887, 897 (Pa. 1991) ("[A]s this Court has stated repeatedly in interpreting Article 1, Section 8, that provision is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries."). Unsurprisingly, for decades, courts have attempted to delineate the exact parameters of these protections. The breadth of case law in this area is thus extensive.

***Commonwealth v. Hawkins-Davenport***, 352 A.3d 92, 99 (Pa. 2026).

Statements made during a custodial interrogation

are presumptively involuntary, unless the accused is first advised of ***Miranda*** rights. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. The ***Miranda*** safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. Thus, interrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect. In evaluating whether ***Miranda*** warnings were necessary, a court must consider the totality of the circumstances.

Whether a person is in custody for ***Miranda*** purposes depends on whether the person is physically denied of his freedom of action in any significant way[,] or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes his freedom of action is being restricted.

- 11 -

Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest. Thus, the ultimate inquiry for determining whether an individual is in custody for *Miranda* purposes is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Commonwealth v. Gonzalez*, 979 A.2d 879, 887-88 (Pa. Super. 2009)

(citations, ellipses, brackets, and internal quotation marks omitted).

However,

[t]he usual traffic stop constitutes an investigative rather than a custodial detention, unless, under the totality of the circumstances, the conditions and duration of the detention become the functional equivalent of arrest. Since an ordinary traffic stop is typically brief in duration and occurs in public view, such a stop is not custodial for *Miranda* purposes.

*Commonwealth v. Mannion*, 725 A.2d 196, 202 (Pa. Super. 1999) (*en banc*) (citations omitted). "An ordinary traffic stop becomes 'custodial' when the stop involves coercive conditions, including, but not limited to, the suspect being forced into a patrol car and transported from the scene or being physically restrained." *Id.* (citation omitted).

In determining whether, as Appellant alleges, he involuntarily consented under the totality of the circumstances, the following principles guide our review:

In determining the validity of a given consent, the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances. The standard for measuring the

- 12 -

scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent. Such evaluation includes an objective examination of the maturity, sophistication and mental or emotional state of the defendant. … Gauging the scope of a defendant's consent is an inherent and necessary part of the process of determining, on the totality of the circumstances presented, whether the consent is objectively valid, or instead the product of coercion, deceit, or misrepresentation.

*Commonwealth v. Smith*, 77 A.3d 562, 573 (Pa. 2013) (citations and quotation marks omitted).

Other factors relevant to a determination of the validity of a consent to search include

1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including the degree of coerciveness; 8) whether the person has been told that he is free to leave; and 9) whether the citizen has been informed that he is not required to consent to the search.

*Commonwealth v. Benitez*, 218 A.3d 460, 479-80 (Pa. Super. 2019) (quoting *Commonwealth v. Powell*, 994 A.2d 1096, 1102 (Pa. Super. 2010) (citation omitted)).

Further, the fact that an officer advises a defendant of his right to refuse a search may be a significant factor in determining whether a defendant's consent was voluntarily given. *Acosta*, 815 A.2d at 1087. Nevertheless,

there is no requirement that a police officer advise a person that he or she may refuse consent to be searched. Unless the totality of factors indicate that the consent was the product of express or implied duress or coercion, the mere fact that a police officer did

- 13 -

not specifically inform an appellant that he or she could refuse the request will not in and of itself result in a determination that the subsequent search was involuntary.

***Benitez***, 218 A.3d at 480 (quoting ***Commonwealth v. Moultrie***, 870 A.2d 352, 360 (Pa. Super. 2005) (citation and emphasis omitted)). With this in mind, we review the evidence presented at the suppression hearing, in a light most favorable to the Commonwealth as the prevailing party. ***See Foster***, 332 A.3d at 1194-95.

At the suppression hearing, the Commonwealth presented the testimony of Trooper Dwyer. N.T., 3/22/23, at 7. Trooper Dwyer testified that he has been employed by the PSP since October 2018, and with PSP Troop K in Media, Pennsylvania, since March 2021. ***Id.*** at 8. Trooper Dwyer summarized his training and education:

> We go through a six[-]month academy at the [PSP] Academy which entails Vehicle Code violations, Criminal Code violations, interview interrogation, traffic stops, police pursuits. Additionally[,] I have an additional 56 hours of [driving under the influence of alcohol/controlled substances] training. I have approximately 120 hours in the area of criminal interdiction. I have an additional 24 hours in interview and interrogation. I am an Intoxilyzer 9000 operator, and have been trained through multiple agencies.

***Id.*** (punctuation modified). According to Trooper Dwyer, he has been involved in approximately two thousand traffic stops in the past. N.T., 5/25/23, at 11.

Trooper Dwyer testified that on November 8, 2022, at around 1:00 a.m., he was working the "midnight shift" with PSP Trooper Andrew Korrubin. N.T.,

- 14 -

3/22/23, at 8-9. As described by Trooper Dwyer, while conducting radar enforcement at Interstate 95 mile marker 11.4 in Tinicum Township,

> I observed a vehicle traveling southbound[. I]t was a red Chevy Camaro with a paper tag. It was captured on radar at 92 [MPH].[4] **We then left our stationary position to conduct a traffic stop. At that point,** [**Appellant's**] **vehicle accelerated**. There was active construction on Interstate 95 southbound; that is a four-lane highway. The four lanes of travel digressed from four to one lane. The right lane, right center, and left center [are] all closed, leaving only the left lane open for traffic. **At that time, the Camaro started passing cars in the left … gravel shoulder to begin traveling around cars that were traveling in the correct lane of travel.**

*Id.* at 9 (footnote and emphasis added; capitalization and punctuation modified).

Trooper Dwyer explained that in order to stop Appellant, he took Exit Nine, which placed his vehicle in front of Appellant's vehicle, and, with the assistance of PSP Trooper Joseph Darcangelo, he forced Appellant to stop. *Id.* at 10, 17. At the time of the vehicle stop, there were two police vehicles and four PSP troopers at the scene. *Id.* at 17-18.

Trooper Dwyer confirmed that his police unit was equipped with dash-mounted video recording equipment. *Id.* at 10. Trooper Dwyer also wore a wireless Bluetooth microphone attached to his jacket or lapel. *Id.*

_____

[4] Trooper Dwyer testified that the posted speed limit for that location was 55 miles per hour. N.T., 3/22/23, at 8.

Trooper Dwyer testified that he made contact with Appellant, the driver and sole occupant of the red Camaro. *Id.* Trooper Dwyer described what next transpired:

Due to [Appellant's] erratic driving, and trying to pass cars on the shoulder, … [h]e was removed from the vehicle. [Appellant] had rolled his windows down for us. We had observed … an Adidas-style satchel in the back seat. I have recovered numerous firearms from these satchels and narcotics. [Appellant] related that he was just trying to go home to use the restroom. I asked him if there [were] any firearms in the vehicle on numerous occasions; **he did not answer me**. He would not look at me. He eventually said there was a knife in the vehicle and then at one point stated there was more than a knife in the vehicle. And then [he] ultimately related to me that there was a Taurus pistol in the satchel bag that we had already observed.

….

[] [Appellant] related that there was a firearm in there [that] he is not licensed to carry in Pennsylvania or any state that I am aware of. I asked [Appellant] for consent to recover that firearm and he provided that consent[,] which was captured on microphone[,] and the firearm was recovered.

*Id.* at 11-12 (emphasis added; punctuation modified).

On cross-examination, Trooper Dwyer confirmed that he observed the Adidas satchel through the window of Appellant's vehicle. *Id.* at 18. Trooper Dwyer further testified as follows:

Q. [Appellant's counsel:] … [W]hen you had [Appellant] out of the car you asked him multiple times if he had a gun in the car, correct?

A. [Trooper Dwyer:] Correct.

Q. And he told you no multiple times?

A. I don't know how many times he said no, multiple times he didn't answer.

Q. And he also asked if he could go home multiple times?

A. Yes[,] he said he wanted to go home[,] yes.

….

Q. … [Y]ou stopped him for the traffic infractions[,] but then you started questioning him about whether there was something in his vehicle that was [il]legal, right?

A. Correct.

Q. You never read him his **Miranda** warnings at any point, right?

A. Correct.

Q. And he was never free to leave at any point, correct?

A. Correct.

Q. You couldn't actually see a firearm at all[,] right when you were asking him about it?

A. No.

*Id.* at 19-20.

Trooper Dwyer also authenticated the video and audio recordings of the traffic stop. *Id.* at 13-15. The Commonwealth played the video/audio recordings (admitted into evidence as Exhibits C-1 and C-2)[5] for the suppression court. *Id.* at 14-15.

_____

[5] Exhibit C-1 is the video recording taken from the dash camera in Trooper Dwyer's vehicle. N.T., 3/22/23, at 15. Exhibit C-2 is the video recording taken from the dash camera in Trooper Darcangelo's vehicle. *Id.*

At the May 25, 2023, hearing, the Commonwealth presented additional testimony by Trooper Dwyer. Trooper Dwyer again described the events that led to Appellant's traffic stop. N.T., 5/25/23, at 9-10. Trooper Dwyer further described his efforts to obtain Appellant's consent to search the red Camaro:

Q. [The Commonwealth:] … When you initially asked for [Appellant's] consent to search the vehicle, what did [Appellant] do?

A. [Trooper Dwyer:] [Appellant] multiple times said he wanted to go home. He never once says no when we asked to search the vehicle. He looked away from me. He told me there was a knife in the car. Then he ultimately says that he goes to the range and has a [T]aurus firearm in the backseat in the bag.

Q. And eventually [Appellant] gives you consent to retrieve that firearm?

A. He does, yes.

Q. … Approximately how many times have you requested consent to search a vehicle throughout your time as a trooper?

A. I probably made around 2,000 traffic stops. Of that probably around ten percent, or 200 times, I've asked [for] consent.

Q. And within those 200 times that you request[ed] consent to search, how many times has the suspect been either evasive, or none [sic] responsive to your requests?

A. It's almost never. It's a yes or no question. Sometimes people … will ask additional questions, like why do you want to search, or what are you searching for? Almost never do they just stay mute, or just completely avoid the question at hand.

Q. And what does that suggest to you?

….

A. The general nervousness of the contents of the vehicle.

*Id.* at 11-12.

Trooper Dwyer further explained that he initially stopped Appellant's vehicle based upon Appellant passing other vehicles, on the shoulder of the highway, and speeding. *Id.* at 18. According to Trooper Dwyer, he extended the investigative detention of Appellant because the troopers

> still didn't figure out [why Appellant] was trying to flee the stop. He had valid insurance, valid registration. All it was was speeding at that time.

*Id.*

Regarding the Adidas satchel, Trooper Dwyer testified that he has encountered a firearm in that type of bag "[p]robably around two dozen times between my investigations, or my partners['], or someone else assisting." *Id.* at 13. Trooper Dwyer confirmed that he continued to request Appellant's consent to search because

> I was waiting for an answer. He never said no. … [O]nce [Appellant] says no, then that would conclude me asking for consent, and there would be possibly different avenues we would take to attempt to search the vehicle.

*Id.* at 13-14.

On cross-examination, Trooper Dwyer stated that he asked Appellant, several times, why Appellant attempted to evade the traffic stop. *Id.* at 16. Appellant claimed that his stomach hurt and he was trying to get home. *Id.* Trooper Dwyer further confirmed that when Appellant inquired whether he was free to go home, Trooper Dwyer responded in the negative. *Id.* at 17-18.

In its opinion, the trial court explained its reasons for denying Appellant's suppression motion:

[Appellant] was subject to a lawful investigative detention. Trooper Dwyer was conducting radar speed enforcement on I-95 [southbound], when a red Camaro passed his vehicle travelling at 92 MPH in a posted 55 MPH zone. [Appellant's Camaro] accelerated away and passed a vehicle in the left shoulder on two occasions, without using a turn signal. Therefore, the initial traffic stop of [Appellant] was justified based on his observed traffic violations, including speeding and improper lane changes.

[T]he incident at bar did not rise to the level of a custodial detention and therefore police only needed reasonable suspicion. After [Appellant] was ordered out of the car, responding troopers began speaking with [Appellant], inquiring why he had eluded the police and if the reason he ran was because there was anything illegal in the vehicle. These questions were directly related to the reason for the stop—the speeding, passing cars impermissibly in the shoulder lane, and not pulling over immediately for the police. Additionally, Trooper Dwyer testified in the approximately 2,000 traffic stops he has conducted, about 200 of those involved requesting consent to search a vehicle. When asked [in] how many of those incidents was [the] suspect nonresponsive like [Appellant] was, he indicated almost never. Prior to the admission of the firearm, [Appellant] indicated he had a knife in the vehicle. Which further gave troopers reasonable suspicion that criminal activity was afoot. Thus, this entire investigative detention was supported by reasonable and articulable suspicion.

… [Appellant's] consent to search the vehicle was voluntary. Trooper Dwyer asked [Appellant] multiple times whether the police have consent to search his vehicle, in which [Appellant] eventually indicated yes. Trooper Dwyer never threatened anything and indicated multiple times [Appellant] had the option of saying either yes or no. Thus, the totality of the circumstances indicates that the consent was given voluntarily and not the result of coercion or duress.

Trial Court Opinion, 9/3/25, at 4. Finally, the trial court had the benefit of video and audio recordings of the entire traffic stop. Upon our review of the

evidence presented at the hearing, including the video and audio recordings, we agree with the sound reasoning of the trial court, as set forth above. *See id.*

Our review of the video evidence discloses that although four uniformed officers were at the scene, these officers constantly were moving around the scene of the traffic stop, and not standing near Appellant throughout the requests for his consent. *See* Exh. C-2. Further, it appears when requesting Appellant's consent to search, Trooper Dwyer remained courteous and non-threatening. *See id.* At best, Trooper Dwyer did not pressure Appellant to consent to the search, but merely asked Appellant to provide an answer, yes or no. *See id.*

We additionally conclude that Appellant's reliance on *Acosta* is misplaced. In *Acosta*, this Court described the circumstances underlying the defendant's consent to search during a traffic stop:

> Officer Monaghan … informed [the driver] that the police were having trouble with drug trafficking on that highway. He asked [the driver] whether he had any weapons or narcotics in the vehicle. When [the driver] said "no," Officer Monaghan asked [the driver] whether he would allow him to search the vehicle.
>
> Although [the driver] acquiesced in the officer's request, that request was made while the officer retained the [driver's] registration, insurance card, and the ID card. The officer never indicated in any way that [the driver] was free to leave before he requested consent. The officer acknowledged that he was not certain whether he would have permitted [the driver] to leave the

scene had he attempted to do so. Furthermore, the entire conversation was in English.[6]

When the consent was requested, [the driver] was standing in front of one of three police vehicles on the scene with their overhead lights activated. Additionally, three officers—Officer Monaghan and Officer Hart[,] and Officer Derek Goldstein—stood next to each other in close proximity to [the driver] when consent was requested. [The driver] was not provided with any consent forms advising him that he had a right not to consent and he did not give a written consent. In short, he was never advised in any way that he was free not to consent to the search.

*Acosta*, 815 A.2d at 1081 (footnote added). The officers subsequently discovered controlled substances in the car, and arrested the driver. The *Acosta* Court affirmed the suppression court's determination that "the consent was not the product of an essentially free and unconstrained choice and was thus involuntary." *Id.* at 1082. The *Acosta* Court reasoned as follows:

[T]he trial court found that the following coercive factors were present when Monaghan requested [the defendant driver's] consent for the search: (1) the existence of a prior, lawful detention; (2) the withholding of [the driver's] vehicular documentation; (3) the presence of other officers and marked

---

[6] In *Acosta*, this Court observed that the Commonwealth presented conflicting evidence regarding Acosta's fluency in English. As the *Acosta* Court observed,

[b]efore and during the searches of Acosta's vehicle, the officers conversed entirely in English. However, at the police station, [the officer] felt it necessary to have Acosta advised of his *Miranda* rights in Spanish, and Acosta confirmed that he "knew English a little bit" but was more comfortable speaking in Spanish.

*Acosta*, 815 A.2d at 1085 n.4 (citations omitted).

police cars with flashing lights in close proximity to [the driver]; and (4) the absence of an express endpoint to the detention in the form of an admonition by the authorities that [the defendant driver] was free to leave.[] Each of these factors, standing alone, may not be sufficient to establish coercion. However, the presence of all of these factors, under the totality of the circumstances, lead us to conclude that [the driver's] consent was not "the product of an essentially free and unconstrained choice [,]" but was "the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances." The evidence supports the trial court's finding that [the driver's] consent was not "voluntary".

*Id.* at 1084-86 (footnote and citations omitted).

Although this case does share some similarities with *Acosta*, a review of the record supports the trial court's determination that Appellant's consent was the result of a free and unconstrained choice. Instantly, Trooper Dwyer had several independent and articulable observations supporting his investigative detention. Trooper Dwyer observed Appellant speeding, Appellant's flight by driving evasively upon observing the PSP vehicle, Appellant's inability to give a yes-or-no answer regarding consent to search, and Trooper Dwyer's view of an opaque bag similar to those he had previously seen used to hide contraband. As stated above, Trooper Dwyer first requested Appellant's consent to search the vehicle before Appellant produced his vehicle documentation. The investigative detention was "extended" only by Appellant's refusal to answer whether he consented to a vehicle search.

Similarly, this Court's decision in *Malloy* is inapposite. In *Malloy* a police officer legally stopped a vehicle for a missing license plate. *Malloy*, 257 A.3d at 145. During the stop, the officer asked Malloy, *a passenger*, for

- 23 -

identification. *Id.* When Malloy produced his identification on a lanyard, the officer inquired whether Malloy possessed a firearm. *Id.* The officer explained that in his experience, individuals "who worked in armed security positions at local bars" often carried their identification badges on lanyards. *Id.* Malloy confirmed he possessed a firearm for his employment as a bar's security guard. *Id.* The officer secured the firearm for safety reasons, and then questioned Malloy about his firearm licensure. *Id.* at 146. Malloy produced an expired Act 235 card,[7] which would have authorized Malloy to carry the firearm as a part of his employment. *Id.* After verifying that Malloy lacked a valid license to carry a firearm, the officer placed him under arrest. *Id.* Subsequently, a trial court found Malloy guilty of firearms offenses. *Id.*

On appeal, this Court concluded the officer unlawfully prolonged the initial traffic stop by ordering Malloy, a passenger, to produce documentation confirming his right to carry a firearm. *Id.* at 154-55. We held such a request was not "an ordinary inquiry incident to the traffic stop." *Id.* at 152. This Court opined that

> neither the trial court nor the Commonwealth offer[ed] any explanation as to how or why a passenger's firearms licensure status relate[d] to … the safe and financially responsible operation of a motor vehicle in general. We are convinced that a passenger's legal authority to own or possess a firearm is simply unrelated to

_____

[7] Act 235 refers to the Lethal Weapons Training Act, which was enacted to provide for the "education, training, and certification of such privately employed agents who, as an incidence to their employment, carry lethal weapons." Act. No. 1974-235, P.L. 705 (Oct. 10, 2974, 22 P.S. § 42(b)).

a driver's authority to operate a motor vehicle, the existence of outstanding warrants against the driver, and whether a lawfully detained vehicle is properly registered or insured….

\* \* \*

… Before [requesting the firearm's documentation, the officer] possessed no evidence showing that [Malloy] was involved in criminal activity[ or] had engaged in furtive movements, that recent gun-related criminal activity had occurred in the vicinity of the stop, or that criminal activity (apart from an improperly displayed license plate) had taken place in the vehicle in which [Malloy] was traveling as a passenger. In addition, neither the trial court nor the Commonwealth points to evidence linking [Malloy] to criminal activity or furtive movements prior to [the officer's] request [for] documentary proof that he was authorized to carry a firearm.

*Id.* at 152, 154.

Here, by contrast, the Commonwealth provided evidence supporting Trooper Dwyer's articulable suspicion regarding the presence of contraband within Appellant's vehicle, based upon Appellant's speeding and attempts to evade the traffic stop. Thus, Appellant's reliance on *Malloy* and *Acosta* is unavailing.

For the foregoing reasons, we conclude the investigative detention of Appellant was supported by reasonable and articulable suspicion, and Appellant voluntarily consented to the search of his vehicle. Consequently, we discern no error or abuse of the trial court's discretion when it denied Appellant's suppression motion.

Judgment of sentence affirmed.

- 25 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/9/2026